1  Bruce L. Simon (SBN 96241)
   Esther L. Klisura (SBN 221171)
2  PEARSON, SIMON, SOTER, WARSHAW & PENNY LLP
   44 Montgomery Street, Suite 1200
3  San Francisco, CA 94104
   Telephone:    (415) 433-9000
4  Facsimile:    (415) 433-9008
   Email:        bsimon@psswplaw.com
5
   Thomas V. Girardi (Bar No. 36603)
6  J. Paul Sizemore (Bar No. 254981)
   Jennifer Lenze (Bar No. 246858)
7  GIRARDI KEESE
   1126 Wilshire Boulevard
8  Los Angeles, CA 91101
   Telephone:    (213) 977-0211
9  Facsimile:    (213) 481-1554
   Email:        tgirardi@girardikeese.com
10
   Glenn J. Stanford
11 TAM & STANFORD
   1001 Bishop Street, Suite 1100
12 American Savings Bank Tower
   Honolulu, HI 96803
13 Telephone:    (808) 522-9111
   Facsimile:    (808) 554-3660
14 Email:        stanford@hawaiirr.com

15 [Additional counsel listed on signature page]
   *Counsel for Plaintiff 50th State Distributors, Inc.*
16 *and the Proposed Class*

17

18                 **UNITED STATES DISTRICT COURT**

19              **NORTHERN DISTRICT OF CALIFORNIA**

20

21  50TH STATE DISTRIBUTORS, INC., on        )  Case No.
    behalf of itself and all others similarly )
22  situated,                                 )
                                              )  **CLASS ACTION COMPLAINT**
23              Plaintiff,                     )
                                              )  **DEMAND FOR JURY TRIAL**
24       vs.                                   )
                                              )
25  MATSON NAVIGATION COMPANY,                )
    INC.; ALEXANDER & BALDWIN, INC.;          )
26  HORIZON LINES, LLC; and HORIZON           )
    LINES, INC.,                              )
27                                            )
                Defendants.                   )
28  _____  )

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**

## I.     INTRODUCTION

1.     Plaintiff 50th State Distributors, Inc. brings this action on behalf of itself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in the United States, and its territories and possessions, who purchased domestic containerized ocean shipping services for service between the continental United States and Hawaii ("Hawaiian Ocean Shipping") directly from a defendant from at least May 23, 2004 to the present (the "Class Period").

2.     Defendants are domestic ocean shipping liners who collectively transport millions of revenue tons of cargo each year between ports in the contiguous United States and in the United States' territories and possessions.  Defendants serve routes between the West Coast and Hawaii, and they are the only container service competitors of each other on these routes.  Plaintiff alleges that during the Class Period, defendants conspired, combined and contracted to fix, raise, maintain, and stabilize the price at which Hawaiian Ocean Shipping would be sold.

3.     As a result of defendants' unlawful conduct, plaintiff and the other members of the Class paid artificially inflated prices for Hawaiian Ocean Shipping.  Such prices exceeded the amount they would have paid if the prices had been determined by a competitive market without the conspiracy.

## II.     JURISDICTION AND VENUE

4.     Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to recover treble damages and costs of suit, including reasonable attorneys' fees, against defendants for the injuries sustained by plaintiff and the members of the Class by reason of the violations, as hereinafter alleged, of Section 1 of the Sherman Act (15 U.S.C. § 1).

5.     This action is also instituted to secure injunctive relief against defendants to prevent them from further violations of Section 1 of the Sherman Act, as hereinafter alleged.

/ / /

6.    Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337 and by Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26).

7.    Venue is proper in this judicial district because, during the Class Period, one or more of the defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

## III.    INTRADISTRICT ASSIGNMENT

8.    This action arises in Alameda County because that is where a substantial part of the events give rise to the claim occurred.  Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or the Oakland Division.

## IV.    THE PARTIES

**A.    Plaintiff**

9.    Plaintiff 50th State Distributors, Inc. is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  During the Class Period, plaintiff purchased Hawaiian Ocean Shipping directly from one or more defendants.  As a result of the alleged conspiracy, plaintiff was injured in its business and property by reason of the antitrust violations alleged herein.

**B.    Defendants**

10.    Defendant Matson Navigation Company, Inc. is a Hawaii corporation with its principal place of business in Oakland, California.  Matson Navigation Company, Inc. is an ocean carrier of containerized freight and automobiles between the West Coast and Hawaii, Guam and Mid-Pacific.  It handles approximately 67 percent of the goods shipped from the West Coast to Hawaii.  Matson Navigation Company, Inc. is a wholly-owned subsidiary of defendant Alexander & Baldwin, Inc.  During the Class Period, Matson sold Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

11.    Defendant Alexander & Baldwin, Inc. is a Hawaii corporation with its principal place of business in Honolulu, Hawaii.  Alexander & Baldwin, Inc. is a diversified corporation

1  that provides ocean transportation services through defendant Matson Navigation Company,

2  Inc., the largest of its subsidiaries.  During the Class Period, Alexander & Baldwin, Inc. sold

3  Hawaiian Ocean Shipping to customers in the United States and its territories and possessions.

4      12.    Defendant Matson Navigation Company, Inc. and defendant Alexander &

5  Baldwin, Inc. are collectively referred to herein as "Matson."

6      13.    Defendant Horizon Lines, LLC is a Delaware limited liability company with

7  its principal place of business in Charlotte, North Carolina.  It operates a fleet of 21 U.S.-

8  flag containerships and 5 port terminals linking the continental United States with Alaska,

9  Hawaii, Guam, Micronesia, and Puerto Rico.  Horizon Lines, LLC is a wholly owned

10  operating subsidiary of defendant Horizon Lines, Inc.  During the Class Period, Horizon

11  Lines, LLC sold Hawaiian Ocean Shipping to customers in the United States and its

12  territories and possessions.

13      14.    Defendant Horizon Lines, Inc. is a Delaware corporation with its principal

14  place of business in Charlotte, North Carolina.  It is publicly traded on the New York

15  Stock Exchange.  It operates as a holding company for its wholly-owned subsidiaries,

16  including defendant Horizon Lines, LLC.  Together with its subsidiaries, Horizon Lines,

17  Inc. is the nation's leading domestic ocean shipping and integrated logistics company,

18  accounting for approximately 38 percent of total U.S. marine container shipments from the

19  continental United States to Alaska, Puerto Rico, Hawaii, Guam, and Micronesia.  During

20  the Class Period, Horizon Lines, Inc. sold Hawaiian Ocean Shipping to customers in the

21  United States and its territories and possessions.

22      15.    Defendant Horizon Lines, LLC and defendant Horizon Lines, Inc. are

23  collectively referred to herein as "Horizon."

24  **C.    Agents and Co-Conspirators**

25      16.    The acts alleged against the defendants in this Complaint were authorized,

26  ordered, or done by their officers, agents, employees, or representatives, while actively

27  engaged in the management and operation of defendants' businesses or affairs.

28  / / /

CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL                                3

17.    Certain other persons, firms, corporations and entities have participated as unnamed co-conspirators as defendants in the violations and conspiracy alleged herein.  In order to engage in the offenses charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged herein.

18.    At all relevant times, each defendant was an agent of each of the remaining defendants, and in doing the acts alleged herein, was acting within the course and scope of such agency.  Each defendant ratified and/or authorized the wrongful acts of each of the defendants.  Defendants, and each of them, are individually sued as participants and as aiders and abettors in the improper acts and transactions that are the subject of this action.

## V.    CLASS ACTION ALLEGATIONS

19.    Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a) and (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following Class:

> All persons and entities in the United States, and its territories and possessions, who purchased containerized domestic ocean shipping services for service between the continental United States and Hawaii ("Hawaiian Ocean Shipping") directly from a defendant from at least May 23, 2004 to the present.  This class excludes any judicial officer who is assigned to hear any aspect of this action, governmental entities, defendants, co-conspirators, other sellers or providers of Hawaiian Ocean Shipping, and the present and former parents, predecessors, subsidiaries and affiliates of the foregoing.

20.    Plaintiff believes that there are hundreds, if not thousands, of Class members as above described, the exact number and their identities being known by defendants.

21.    The Class is so numerous and geographically dispersed that joinder of all members in impracticable.

22.    There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.    Whether defendants and their co conspirators engaged in a

combination and conspiracy among themselves to fix, raise, maintain

1    and/or stabilize prices of Hawaiian Ocean Shipping and/or engaged in

2    market allocation for those services sold in the United States, and its

3    territories and possessions.

4    b.    The identity of the participants in the conspiracy;

5    c.    The duration of the conspiracy alleged in this Complaint and the

6    nature and character of the acts performed by defendants and their co-

7    conspirators in furtherance of the conspiracy;

8    d.    Whether the alleged conspiracy violated Section 1 of the Sherman

9    Act;

10    e.    Whether the conduct of defendants and their co conspirators, as

11    alleged in this Complaint, caused injury to the business and property

12    of plaintiff and other members of the Class;

13    f.    The effect of defendants' conspiracy on the prices of Hawaiian Ocean

14    Shipping sold in the United States and its territories and possessions

15    during the Class Period; and

16    g.    The appropriate measure of damages sustained by plaintiff and other

17    members of the Class.

18    23.    Plaintiff is a member of the Class, plaintiff's claims are typical of the claims

19    of the Class members, and plaintiff will fairly and adequately protect the interests of the

20    members of the Class.  Plaintiff is a direct purchaser of Hawaiian Ocean Shipping, and its

21    interests are coincident with and not antagonistic to those of the other members of the

22    Class.  In addition, plaintiff is represented by counsel who are competent and experienced

23    in the prosecution of antitrust and class action litigation.

24    24.    The prosecution of separate actions by individual members of the Class

25    would create a risk of inconsistent or varying adjudications.

26    25.    Defendants have acted, and refused to act, on grounds generally applicable to

27    the Class, thereby making appropriate final injunctive relief with respect to the Class as a

28    whole.

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**                                     5

26.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

27.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The Class is readily definable and is one for which records should exist in the files of defendants and their co conspirators.  Prosecution as a class action will eliminate the possibility of repetitious litigation.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous individual actions would engender.  Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## VI.    TRADE AND COMMERCE

28.    During the Class Period, defendants sold substantial quantities of Hawaiian Ocean Shipping in a continuous and uninterrupted flow of interstate commerce to customers throughout the United States.

29.    The business activities of defendants that are the subject of this action were within the flow of, and substantially affected, interstate trade and commerce.

## VII.    FACTUAL ALLEGATIONS

**A.    Importance of Ocean Transport**

30.    Ocean shipping is a highly effective method of moving large quantities of non-perishable goods and raw materials.  The major commodities shipped through ocean shipping include crude petroleum, refined petroleum products, chemicals, manufactured goods, farm products, and coal.

31.    Charges for ocean carriage is made by container size, with containers ranging in size from 20 to 53 feet in length and 8 to 9.5 feet in height.  Charges are also

1  made by revenue ton, which is the greater of the cubic measure or weight of a shipment as

2  packed for shipping, and such charges as the following: base ocean freight, terminal

3  handling charge, fuel surcharge, warfage Hawaii, warfage West Coast, neighbor island

4  arbitrary, drayage, intermodal rail, and demurrage  In 2002, U.S. domestic ocean trades

5  amounted to 196 million metric tons.

6  32.    The shipping industry has been protected by almost all countries in the world

7  because of the industry's importance to national security and defense, as well as

8  international trade.  Since the 1800s, ship owners have participated in liner conferences to

9  coordinate service, exchange market information, and agree upon rates.  In the

10  international ocean shipping industry, these liner conferences, which have many cartel-like

11  characteristics, have been exempt from the antitrust laws.

12  33.    Unlike international ocean shipping, the exchange of market information,

13  agreements on prices, agreements on capacity allocation decisions, and the use of each

14  other's capacity to sell to one's own shippers, are prohibited for carriers operating

15  domestic ocean routes.

16  34.    The domestic ocean trade is comprised of the following three sectors: (a)

17  noncontiguous trade between the continental United States and Puerto Rico, Alaska,

18  Hawaii, Guam, and other U.S. Pacific Islands; (b) coastwise trade along the Atlantic, Gulf,

19  and Pacific coasts, as well as trade between coasts and the St. Lawrence Seaway; and (c)

20  intercoastal trade between the Atlantic or Gulf and pacific coasts by way of the Panama

21  Canal.  This action relates solely to noncontiguous trade between the continental United

22  States and Hawaii.

23  35.    Because of its location, the State of Hawaii depends almost entirely on ocean

24  shipping to import its essential commodities like food, clothing, fuel, building materials,

25  and automobiles, as well as to export its local products like pineapple, sugar, molasses, and

26  livestock, to and from the neighbor islands, the continental United States, and various

27  foreign countries.  By one estimate, 98.6 percent of all Hawaii's imports arrive by ocean

28  shipping.  In 2003, over 5 million metric tons of cargo was shipped in noncontiguous

1  domestic trade with Hawaii.

2    36.    Using an estimate built up of: 6 sailings per week from the US west coast,

3  for 52 weeks per year, at an average of 1,000 containers per sailing for both container

4  carriers combined, at an average revenue of about $5,000 per container, plus some small

5  revenues in the eastbound direction, the current container revenue in the Hawaii trade is

6  over $1.5 billion.

7    37.    In January 2008, *Pacific Business News* reported that the cost of shipping

8  goods to Hawaii had risen as much as 40 percent since 2005.  This was in large part a

9  result of defendants' conspiracy as alleged herein.

10  **B.    Inferential Evidence of Cartel Activity in the Hawaiian Ocean Shipping**

11  **Industry**

12    38.    The Hawaiian Ocean Shipping industry has several characteristics that

13  facilitated a conspiracy, including market concentration, ease of information sharing,

14  homogeneity of products, and significant barriers to entry.

15    39.    The Hawaiian Ocean Shipping market is a duopoly that is conducive to

16  collusion.  Defendants Matson and Horizon control 100 percent of the containerized

17  market and 96 percent of the total market for Hawaiian Ocean Shipping, with the

18  remaining 4 percent of cargo being carried by small specialized barge and auto carrier

19  lines.

20    40.    Each of the defendants herein participates in trade association activities that

21  have provided opportunities for information sharing.  For example, each of the defendants

22  is a member of the Maritime Cabotage Task Force ("MCTF"), a lobbying group founded

23  in 1995 to oppose efforts to open the market for non-contiguous shipping.  Philip Grill of

24  Matson is the Chairman of the MCTF's Board of Directors, and Chuck Raymond and

25  Robert Zuckerman of Horizon are Board members.  Thus, the executives of Matson and

26  Horizon have close relationships that have fostered the conspiracy herein.

27    41.    Additionally, each of the defendants here has ready access to industry data

28  that facilitates effectuation and monitoring of the conspiracy.  For example, PIERS, which

1  stands for Port Import Export Reporting Service, collects and distributes, for a fee, data for

2  the maritime industry. This data includes for example, container size and quantity, cargo

3  quantity and unit of measure, cargo weight and volume. This type of information within

4  the industry has allowed defendants to monitor their conspiracy and verify that it is

5  working.

6      42.    Hawaiian Ocean Shipping services are homogenous and fungible because

7  almost all cargo shipping today is containerized, and any container vessel can readily

8  substitute for any other in carrying such cargo containers. Most purchasers decide, and

9  competitors compete, largely based on price. Although fungible between carriers,

10  Hawaiian Ocean Shipping is not readily substitutable for by other methods of

11  transportation. For example, shipping heavy, bulky goods by air freight is prohibitively

12  expensive, and there obviously are no road or rail routes between the mainland United

13  States and Hawaii.

14      43.    There are substantial barriers to enter the Hawaiian Ocean Shipping market,

15  including: (a) entrenched market positions by the incumbent shipping companies; (b) the

16  high costs associated with ocean transport vessels and to build the infrastructure for those

17  vessels; (c) the need to develop a customer base; (d) constraints on port space; and (e)

18  restrictions imposed by the Merchant Marine Act of 1920 at 26 U.S.C. § 100 *et seq.*

19  (commonly referred to as the "Jones Act"). These barriers facilitate the conspiracy alleged

20  herein because they insulate existing shipping companies from new competition and

21  perpetuate the high market concentration.

22  **C.    The Jones Act**

23      44.    The Jones Act is a protectionist statute that prohibits any goods "transported

24  by water, or by land and water . . . between points in the United States . . . either directly or

25  via a foreign port," from being shipped unless the vessel "is wholly owned by citizens of

26  the United States for purposes of engaging in the coastwise trade" and has been issued a

27  "certificate of documentation" or is exempt from documentation. 46 U.S.C. § 55102.

28  / / /

45.    The purpose of the Jones Act is to protect American shipping companies. It grants an exclusive privilege to certain U.S.-made, U.S.-manned, U.S.-flagged, and U.S. Coast Guard approved vessels to engage in ocean shipping of merchandise or goods to or from U.S. territories, possessions, or non-contiguous States. These laws are restrictive, prohibiting all other vessels, such as foreign-flagged, foreign-built, foreign-crewed, or even foreign-refurbished vessels, from engaging in this trade.

46.    The Jones Act's restriction on the carriage of domestic cargoes to U.S.-made, U.S.-flagged, U.S.-crewed, and U.S.-owned ships control, combined with the relatively small size of these trade routes, resulted in an essentially duopolistic Hawaiian Ocean Shipping market.

47.    The Jones Act, however, provides no immunity to defendants for their collusion, market sharing, and/or price fixing, and the conspiracy alleged herein is illegal under the Sherman Act.

**D.    Defendants' Collusive Conduct**

48.    Defendants have conspired to fix, raise, maintain and/or stabilize prices for Hawaiian Ocean Shipping.

49.    A major feature of defendants' conspiracy has been to share capacity on each other's ships. Defendants' capacity sharing arrangement allows each carrier to transport cargo on its competitor's ships at preferential rates. Without this collusion and capacity sharing arrangement, defendants would have had to add additional vessels to their routes in order to carry their customers' cargo, which would result in more capacity, more frequent service, and lower prices. The capacity sharing arrangement was the functional equivalent of two duopolists acting like a monopoly. A study published by the United States Department of Transportation's Maritime Administration in May 2006 explicitly equated excess capacity with competition by stating, ". . . competitive downward pressure on freight rates may result from overcapacity."

50.    In August 2001, Horizon (then CSX Lines) began shipping on Matson's mid-week sailing from Los Angeles, eventually withdrawing its own bi-weekly service.

1  Horizon advertises this mid-week sailing as its "mid-week express."  Less regularly,

2  Matson also ships containers on Horizon's sailings when Matson's own sailings are full.

3       51.    Another feature of the trade has been parallel, identical, and near

4  simultaneous imposition of fuel surcharges.  Fuel surcharges are a separate component of

5  the cost to ship cargo that is supposed to assist the carrier recover fuel costs.  Matson and

6  Horizon justify their fuel surcharges by claiming that the surcharges are necessary to offset

7  the increases in fuel costs.  In a truly competitive market, the imposition of a fuel

8  surcharge by a carrier that exceeds the actual cost of fuel consumed should create

9  competition from others.  The more fuel efficient operator should finds ways to capture

10  cargo from the less fuel efficient operator, and pricing would be one of those ways.  Here,

11  however, defendants chose not to price compete, and a plausible explanation for that lack

12  of competition in this duopoly is that defendants were conspiring.  Horizon itself

13  acknowledged the lack of competition in a February 1, 2008 press release, which states

14  "we were able to generate net income and earnings per share" based in part on "a stable

15  rate environment in all three of our offshore markets."

16       52.    Matson and Horizon have imposed identical fuel surcharges during the Class

17  Period.  They both introduced fuel surcharges for the first time in October 1999.  Both

18  liners charged the same fuel surcharge – 1.75 percent of revenue.  Since then, each liner

19  has adjusted fuel surcharges 27 times – each adjustment occurred within days of the

20  competitor's adjustment and was for the same amount.  The following chart illustrates

21  defendants' lockstep behavior:

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

| Effective Month & Year | Matson | Horizon |
|------------------------|--------|---------|
| October 1999 | 1.75 | 1.75 |
| February 2000 | 2.25 | 2.25 |
| April 2000 | 3.25 | 3.25 |
| October 2000 | 4.25 | 4.25 |
| November 2001 | 3.25 | 3.25 |
| May 2002 | 4.75 | 4.75 |
| October 2002 | 6.0 | 6.0 |
| March 2003 | 7.5 | 7.5 |
| May 2003 | 8.0 | 8.0 |
| June 2004 | 8.8 | 8.8 |
| October 2004 | 9.2 | 9.2 |
| April 2005 | 10.5 | 10.5 |
| July 2005 | 11.5 | 11.5 |
| October 2005 | 13.0 | 13.0 |
| January 2006 | 15.0 | 15.0 |
| April 2006 | 18.5 | 18.5 |
| June 2006 | 21.25 | 21.25 |
| October 2006 | 19.75 | 19.75 |
| November 2006 | 18.75 | 18.75 |
| January 2007 | 17.5 | 17.5 |
| March 2007 | 19.5 | 19.5 |
| May 2007 | 20.75 | 20.75 |
| May 2007 | 22.5 | 22.5 |
| August 2007 | 24.0 | 24.0 |
| December 2007 | 29.0 | 29.0 |
| February 2008 | 31.5 | 31.5 |
| April 2008 | 33.75 | 33.75 |

1    53.    Although Matson and Horizon claimed that these fuel surcharges were

2  necessary to recoup increased costs, the surcharges did not reflect actual fuel cost

3  increases.  Fuel costs among ocean liners vary significantly due to a number of unique

4  factors, such as differences in vessels and fuel efficiency, different routes, the use of

5  hedging, and individual fuel conservation efforts.  It is highly unlikely, if not impossible,

6  that Matson and Horizon incurred identical fuel expense increases.  Furthermore, the

7  revenue generated by the fuel surcharges depends on the underlying revenues generated

8  per container and container utilization, both of which vary between the two carriers.  Thus,

9  there is no way that these fuel surcharges only raised enough additional revenue to cover

10  the increased costs that each carrier experienced.

11    54.    In addition to the lockstep fuel surcharge increases, Matson and Horizon

12  have acted in lockstep on other matters as well.  In the spring of 2006, Matson announced

13  that it would make surcharge changes whenever it deemed necessary, rather than on a

14  quarterly basis as had been its prior practice.  Shortly thereafter, Horizon changed its

15  longstanding policy and announced it would adjust fuel surcharges "in a more timely

16  manner."

17    55.    Defendants' lockstep pattern was broken for the first time this month.  On

18  May 9, 2008, Horizon announced that it would raise its fuel surcharge from 33.75 percent

19  to 35.25, percent, effective June 8.  On May 19, 2008, Matson announced that it would

20  maintain its fuel surcharge at the existing 33.75 percent level.  Two days later, on  May 21,

21  Horizon announced it would *not* implement the previously announced increase and would

22  instead keep the fuel surcharge at the existing rate.  This break in the over 8-year pattern is

23  significant because it occurred only *after* the United States Department of Justice ("DOJ")

24  announced an investigation into the "domestic ocean carriage" industry.

25  **E.    Government Investigation**

26    56.    On April 17, 2008, it was disclosed that the DOJ is investigating "domestic

27  ocean carriage."  The same day, defendant Horizon Lines, Inc. acknowledged that federal

28  agents served warrants and a grand jury subpoena on the company in connection with that

1  investigation.  Defendant Alexander & Baldwin, Inc. confirmed that it was preparing to

2  receive a DOJ subpoena related to "domestic ocean carriage."  Significantly, Alexander &

3  Matson, Inc.'s domestic shipping trade is limited to trade between the continental United

4  States and Hawaii and Guam.  In a quarterly report filed with the United States Securities

5  and Exchange Commission on May 2, 2008, Alexander & Baldwin stated that "Matson

6  understands that while the investigation currently is focused on the Puerto Rico trade, *it*

7  *also includes pricing practices in connection with all domestic trades, including* the

8  Alaska, *Hawaii*, and Guam trades."  (Emphasis added)

9                        **VIII.   FRAUDULENT CONCEALMENT**

10       57.     Plaintiff had no knowledge of the combination and conspiracy alleged

11  herein, or of any facts that might have led to the discovery thereof in the exercise of

12  reasonable diligence, prior to April 17, 2008, when it was revealed that the DOJ was

13  investigating "domestic ocean carriage."

14       58.     Plaintiff could not have discovered the existence of the combination and

15  conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence

16  because of the deceptive practices and techniques of secrecy employed by the defendants

17  and their co-conspirators to avoid detection and affirmatively conceal such violations

18  including.

19       59.     As a result of the fraudulent concealment of the conspiracy, plaintiff asserts

20  the tolling of the applicable statute of limitations affecting the causes of action by plaintiff

21  and the members of the Class.

22                        **IX.    CAUSE OF ACTION**

23       60.     Plaintiff incorporates and re-alleges each allegation set forth in the preceding

24  paragraphs of this Complaint.

25       61.     Beginning at least as early as May 23, 2004 and continuing to the present,

26  defendants and their co-conspirators, by and through their officers, directors, employees,

27  agents, or other representatives, entered into a continuing agreement, understanding, and

28  conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for

1  Hawaiian Ocean Shipping in the United States, and its territories and possessions, in

2  violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

3    62.   Defendants' unlawful conduct resulted in artificially high prices charged by

4  defendants and their co conspirators to plaintiff and the members of the Class for Hawaiian

5  Ocean Shipping.

6    63.   Plaintiff and members of the Class had to pay more for Hawaiian Ocean

7  Shipping than they would have paid in a competitive marketplace.

8    64.   Plaintiff seeks to recover for these overcharge damages.

9    65.   As a direct and proximate result of defendants' scheme, plaintiff and the

10  members of the Class have been injured and financially damaged in their respective

11  businesses and property, in amounts which are presently undetermined.  Plaintiff's injuries

12  consist of paying higher prices to purchase Hawaiian Ocean Shipping than they would

13  have paid absent defendants' conduct.  Plaintiff's injuries are of the type the antitrust laws

14  were designed to prevent and flow from that which makes defendants' conduct unlawful.

### X.    PRAYER FOR RELIEF

16    WHEREFORE, Plaintiff prays as follows:

17    A.    That the Court determine that this action may be maintained as a class action

18  under Rule 23 of the Federal Rules of Civil Procedure.

19    B.    That the contract, combination or conspiracy, and the acts done in

20  furtherance thereof by defendants and their co conspirators, be adjudged to have been in

21  violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

22    C.    That judgment be entered for plaintiff and members of the Class against

23  defendants for three times the amount of damages sustained by plaintiff and the Class as

24  allowed by law, together with the costs of this action, including reasonable attorneys' fees.

25    D.    That defendants, their affiliates, successors, transferees, assignees, and the

26  officers, directors, partners, agents and employees thereof, and all other persons acting or

27  claiming to act on their behalf, be permanently enjoined and restrained from, in any

28  manner:

**CLASS ACTION COMPLAINT; DEMAND FOR JURY TRIAL**                    15

(1)    continuing, maintaining or renewing the contract, combination or conspiracy alleged herein, or from engaging in any other contract, combination or conspiracy having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect; and

(2)    communicating or causing to be communicated to any other person engaged in the manufacture, distribution or sale of any product except to the extent necessary in connection with a bona fide sales transactions between the parties to such communications.

E.    That plaintiff and members of the Class have such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a jury trial, pursuant to Federal Rule of Civil Procedure 38(b), of all triable issues.

Dated:  May 23, 2008                                    Respectfully submitted,

_Esther Klisura_

Bruce L. Simon
Esther L. Klisura
PEARSON, SIMON, SOTER,
WARSHAW & PENNY, LLP
44 Montgomery Street, Suite 1200
San Francisco, CA 94104
Telephone:   (415) 433-9000
Facsimile:    (415) 433-9008

Clifford H. Pearson
Gary S. Soter
Daniel L. Warshaw
PEARSON, SIMON, SOTER,
WARSHAW & PENNY, LLP
15165 Ventura Boulevard, Suite 400
Sherman Oaks, CA 91403
Telephone:   (818) 788-8300
Facsimile:    (818) 788-8104

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Thomas V. Girardi
J. Paul Sizemore
Jennifer Lenze
GIRARDI KEESE
1126 Wilshire Boulevard
Los Angeles, CA 91101
Telephone:   (213) 977-0211
Facsimile:   (213) 481-1554

Glenn J. Stanford
TAM & STANFORD
1001 Bishop Street, Suite 1100
American Savings Bank Tower
Honolulu, HI 96803
Telephone:   (808) 522-9111
Facsimile:   (808) 554-3660

*Counsel for Plaintiff 50th State*
*Distributors, Inc. and the Proposed Class*